IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria M. Gonzalez, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>State of Arizona, et al.,<br><br>    Defendants. | No. CV-06-1268-PHX-ROS<br>consolidated with:<br>No. CV-06-1362-PCT-JAT<br>No. CV-06-1575-PHX-EHC<br><br>**ORDER; FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

This case comprises two actions: (1) <u>Gonzalez v. State of Arizona</u>, CV 06-1268-PHX-ROS (filed May 9, 2006) ("Gonzalez"); and (2) <u>Inter Tribal Council of Ariz., Inc. v. Brewer</u>, No. CV 06-1362-PCT-JAT (filed May 26, 2006) ("ITCA").[1]

Plaintiffs seek to permanently enjoin enforcement of the Arizona Taxpayer and Citizen Protection Act, also known as "Proposition 200." Enacted pursuant to a voter initiative in the 2004 general election, Proposition 200 requires proof of citizenship to register to vote and proof of identification to vote in person on election day. A.R.S. §§ 16-166(F), 579(A).

---

[1] The third consolidated action, <u>Navajo Nation v. Brewer</u>, CV 06-1575-PHX-EHC (filed June 20, 2006), was dismissed by stipulation of the parties on May 27, 2008. (Doc. 775).

1      Collectively, Plaintiffs assert that these requirements violate the Equal Protection

2   Clause, First Amendment, Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a), and Title

3   VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*[2]  (Doc. 352; ITCA, Doc. 1).

4      For the reasons stated below, Plaintiffs' request for relief will be denied.

5                              **PROCEDURAL BACKGROUND**

6      In May and August 2006, Plaintiffs filed motions for preliminary injunction, seeking

7   to enjoin the enforcement of Proposition 200. (Docs. 7, 146, 149). On September 11, 2006,

8   the motions were denied. (Doc. 183).

9      Plaintiffs appealed the denial, (Docs. 184, 189), and requested an emergency

10  injunction pending appeal, see Purcell v. Gonzalez, 549 U.S. 1, 6 (2006).  On October 5, the

11  Ninth Circuit granted the request for an emergency injunction pending appeal.  Id.  The

12  Supreme Court vacated the emergency injunction on October 20, 2006.  Id. at 8.

13     On April 20, 2007, the Ninth Circuit affirmed the Court's order denying preliminary

14  injunctive relief.  Gonzalez v. Arizona, 485 F.3d 1041, 1052 (2007).  The parties then

15  underwent significant discovery and motions practice extending over a year and a half.  The

16  Court endeavored to give Plaintiffs access to all data in Defendants' possession to make their

17  case.

18     Beginning July 9, 2008, the Court held a six-day bench trial to determine whether a

19  permanent injunction should issue.  Post-trial briefing was completed on July 30, 2008.

20                               **FACTUAL BACKGROUND**

21  **I.   Proposition 200**

22     On November 2, 2004, Arizona voters approved a voter initiative called Proposition

23  200, which was officially proclaimed law by Governor Janet Napolitano on December 13,

24

25

26     ───────────────

27     [2] ITCA and Gonzalez Plaintiffs' other claims were dismissed on August 28, 2007 and
February 5, 2008, respectively.  (Docs. 330, 611).

28                                        - 2 -

1    2004.[3]  (Trial Tr. 648).  It was then submitted to the Department of Justice for preclearance

2    under Section 5 of the Voting Rights Act.[4]  Id. Upon approval by the Justice Department,

3    Proposition 200 became effective January 25, 2005.  Id.

4            A.      Proof of Citizenship to Register to Vote

5            Before Proposition 200, a person seeking to register to vote did not need to provide

6    proof of citizenship.  (Ex. 6).  Rather, the person signed a statement, under penalty of law,

7    that the applicant is a U.S. citizen.  Id.

8            Proposition 200, which amended A.R.S. §§ 16-152, 166, requires individuals wishing

9    to register to vote to provide proof of citizenship.  An applicant is still required to affirm,

10   under penalty of law, that the applicant is a U.S. citizen.  A.R.S. § 16-152(14).  Section 16-

11   166, as amended, states:

12           The county recorder shall reject any application for registration that is not
             accompanied by satisfactory evidence of United States citizenship. Satisfactory
13           evidence of citizenship shall include any of the following:
                     1. The number of the applicant's driver license or nonoperating identification
14           license issued after October 1, 1996 by the department of transportation or the
             equivalent governmental agency of another state within the United States if the
15           agency indicates on the applicant's driver license or nonoperating identification
             license that the person has provided satisfactory proof of United States citizenship.
16                   2. A legible photocopy of the applicant's birth certificate that verifies
             citizenship to the satisfaction of the county recorder.
17                   3. A legible photocopy of pertinent pages of the applicant's United States
             passport identifying the applicant and the applicant's passport number or presentation
18           to the county recorder of the applicant's United States passport.
                     4. A presentation to the county recorder of the applicant's United States
19           naturalization documents or the number of the certificate of naturalization. If only the
             number of the certificate of naturalization is provided, the applicant shall not be

20

21           ───────────────

22           [3] The Arizona Constitution authorizes voter initiatives, which then become law "when
             approved by a majority of the votes cast thereon and upon proclamation of the governor."
23           Ariz. Const. art. IV § 1.

24           [4] Arizona is a covered jurisdiction under Section 5 of the Voting Rights Act, 42 U.S.C.
             § 1973c.  Therefore, Arizona is required to preclear any new voting "standard, practice, or
25           procedure" with either the United States Attorney General or the District Court for the
             District of Columbia to ensure its new standard, practice, or procedure does "not have the
26           purpose [or] effect of denying or abridging the right to vote on account of race or color." Id.;
             see also Purcell, 549 U.S. at 6.
27

28                                              - 3 -

1   included in the registration rolls until the number of the certificate of naturalization
2   is verified with the United States immigration and naturalization service by the county
    recorder.
3       5. Other documents or methods of proof that are established pursuant to the
    [I]mmigration [R]eform and [C]ontrol [A]ct of 1986.
4       6. The applicant's bureau of Indian affairs card number, tribal treaty card
    number or tribal enrollment number.

5   A.R.S. § 16-166(F).

6       Without this proof, a person may not register to vote. Id. This includes applicants that

7   use the federal voter registration form or postcard but do not include proof of citizenship.

8   (Trial Tr. 701).   There is no provision that permits waiver of the proof of citizenship

9   requirement.

10      If an applicant does not provide proof of citizenship, the applicant is mailed a letter

11  explaining why the application was rejected and instructing the applicant to submit a new

12  registration form with proper proof of citizenship. (Rodriguez Dep. 77-78, Jan. 22, 2008;

13  Altaha Dep. 12, Jan. 14, 2008; Wayman-Trujillo Dep. 50, 51, Jan. 9, 2008; Rodriguez Dep.

14  23, Aug. 2, 2006; Justman Dep. 15-16, Aug. 1, 2006).   Counties are required to provide a

15  blank voter registration form with this letter.   (Ex.4, at 54).

16      Under the procedures implemented immediately after Proposition 200, an applicant

17  relying on naturalization documents to provide proof of citizenship was required to provide

18  a  "certificate of naturalization number."  (Trial Tr. 654; see also Ex. 147).   It was soon

19  learned, however, that this number could not be used to verify the person's citizenship using

20  the federal immigration online database, the Systematic Alien Verification for Entitlements

21  Program ("SAVE"). (Trial Tr. 654; Ex. 305).   Rather, the database used the alien registration

22  number, or "A-number." (Trial Tr. 654; Ratliff Dep. 32, Apr. 22, 2008).   Consequently,  the

23  election procedures were amended to instruct an applicant to provide the alien registration

24  number, which is also listed on a certificate of naturalization.[5]  (Trial Tr. 654; Ex. 1357).

25  _____

26      [5] Before approximately 1975, certificates of naturalization did not have A-numbers
    printed on them.   (Quinn Dep. 54, Apr. 22, 2008; see also Ex. 961 (certificate of
27  naturalization from 1960 that does not have A-number)).

28                                  - 4 -

1   This change was precleared by the Justice Department on December 6, 2007.  (Kanefield
2   Dep. 8, Jan. 1, 2008).

3           B.      Elector Identification to Cast a Ballot

4                   i.      *Voting In Person on Election Day*

5           Before Proposition 200, a person seeking to vote in person on election day did not
6   need to provide proof of identification.  (Ex. 5).  Rather, the person stated his or her name
7   and residence, and, if the name was found on the voter rolls, the person signed the signature
8   roster and was given a ballot.  Id.

9           After Proposition 200, which amended A.R.S. § 16-579, an elector voting in person
10  on election day must now present proof of identification.  A voter may obtain a regular
11  ballot[6] only by presenting either one form of identification with a photograph, name, and
12  address, or two forms of identification that bear the name and address.  A.R.S. § 16-579(A).

13          The specific types of identification are set forth in the Election Procedures Manual,
14  which has the force and effect of law.  A.R.S. § 16-452(C).  The current version, approved
15  in October 2007 (the "Manual"), was drafted by Secretary of State Jan Brewer and then
16  submitted to Governor Janet Napolitano and Arizona Attorney General Terry Goddard for
17  review and approval.  See generally Ex. 4; A.R.S. § 16-452(A)-(B).  It was then precleared
18  by the Department of Justice.

19          Acceptable forms of identification with a photograph, name, and address are: (1) a
20  valid Arizona driver license; (2) Arizona nonoperating identification license; (3) tribal
21  enrollment card or other form of tribal identification; or (4) other federal, state, or local
22  government issued identification.  (Ex. 4, at 128).

23

24

25

26  ──────────────

27          [6] The different types of ballots are discussed *infra*, Part C.

28                                              - 5 -

Acceptable forms of identification without a photograph that bear the name and address of the elector are: (1) utility bill dated within 90 days of the date of the election;[7] (2) bank or credit union statement dated within 90 days of the date of the election; (3) valid Arizona vehicle registration; (4) property tax statement of the elector's residence; (5) vehicle insurance card; (6) recorder's certificate; or (7) federal, state, or local government issued identification, including a voter registration card issued by the county recorder. Id.

In addition to these forms of identification, an elector who identifies himself or herself as a member of a federally recognized American Indian tribe may present tribal identification, including: (1) a tribal identification or enrollment card issued under the authority of a federally recognized Indian tribe, nation, community, or band, a tribal subdivision or the Bureau of Indian Affairs; (2) a Certificate of Indian Blood issued to a tribal member under the authority of a tribe or by the Bureau of Indian Affairs; (3) a voter registration card for tribal elections issued under the authority of a tribe; (4) a home site assignment lease, permit or allotment issued under the authority of a tribe, tribal subdivision, or the Bureau of Indian Affairs; or (5) a grazing permit or allotment issued to a tribal member under the authority of a tribe, tribal subdivision, or the Bureau of Indian Affairs.[8] (Docs. 775 & 776; Trial Tr. 680-81).

In addition, several counties have added "official election mail" sent by the county to individual voters to the list of acceptable non-photo identification.  (See Trial Tr. 748; Osborne Dep. 60-61, Jul. 31, 2006 (Maricopa County); Dastrup Dep. 10, Aug. 1, 2006 (Navajo County); Hoyos Dep. 27-28, Jan. 16, 2008 (Pinal County); Hansen Dep. 55, Aug.

---

[7] "A utility bill may be for electric, gas, water, solid waste, sewer, telephone, cellular phone, or cable television."  (Ex. 4, at 128).

[8] These forms of tribal identification were part of the terms of settlement in Navajo Nation v. Brewer, CV 06-1575.  They were precleared by the Department of Justice on May 22, 2008, (Doc. 774), and are currently an addendum to the Manual, (Trial Tr. 681).  The next version of the Manual will include this addendum.  Id.

1, 2006 (Coconino County); Pew Dep. 21-22, Aug. 1, 2006 (Apache County); Rodriguez Dep. 145-46, Aug. 2, 2006 (Pima County); Wayman-Trujillo Dep. 107-08, Jan. 9, 2008 (Yavapai County). But see Stallworth Dep. 32-33, Jan. 18, 2008 (Yuma County)).  The counties are not required, however, to provide election mail, and their ability to do so is subject to budgetary constraints.  (See Osborne Dep. 83-84, 86, Jan. 14, 2008; Wayman-Trujillo Dep. 108-09, Jan. 9, 2008).

ii.   *Voting Early*

Proposition 200 did not change the requirements for voting early.  Every registered voter is eligible to vote by early ballot.  A.R.S. § 16-541. Proof of identification is not required to obtain or submit an early ballot.  A.R.S. §§ 16-542, -547.  An early ballot may be mailed or dropped off at a polling place by 7:00 p.m. on election day.  A.R.S. § 16-548.

All counties also allow for in person early voting at certain polling places.  No identification is required of early voters who wish to vote in person.  (Trial Tr. at 689).

All early ballots, whether cast by mail or in person, are subject to signature verification, which the State and counties believe is sufficient to prevent voter fraud.  (Trial Tr. 746; Rodriguez Dep. 151-52, Jan. 22, 2008; Hoyos Dep. 43-44, Jan. 16, 2008; Wayman-Trujillo Dep. 113, Jan. 8, 2008; Owens Dep. 111-12, Aug. 30, 2006; Dastrup Dep. 28, Aug. 1, 2006; Justman Dep. 35, Aug. 1, 2006; Hansen Dep. 70, Aug. 1, 2006; Pew Dep. 19, Aug. 1, 2006; Osborne Dep. 75, July 31, 2006).

C.   Types of Ballots

There are three types of ballots provided for in person voting on election day: regular, provisional, and conditional provisional.  (Ex. 4, at 129).  The type of ballot issued depends upon what form of proof of identification is provided by the voter.  Id.

i.   *Regular Ballot*

If the voter's proof of identification matches the information on the voter rolls, the voter is issued a regular ballot.  Id.

1

ii.    *Provisional Ballot*

2    "If the name and address on the identification do not reasonably appear to be the same

3    as the name and address on the signature roster or the photo does not reasonably appear to

4    be the elector, then the elector shall not be issued a regular ballot, but shall be issued a

5    provisional ballot." Id.; see also id. at 136.  For example, if a person changes her name after

6    marriage, but has not yet updated either the voter rolls or her identification, she will be issued

7    a provisional ballot. (Trial Tr. at 708-09).  In addition, if a voter presents one form of tribal

8    identification, the voter is issued a provisional ballot.  (Ex. 4, at 135).

9    If a voter casts a provisional ballot, the voter is not required to take additional steps.

10   The county verifies that the voter's signature on the provisional ballot matches that on the

11   voter rolls, and, as long as the voter did not already vote for that election, the voter's ballot

12   is counted.  (Ex. 4, at 164-65, 167-69).

13

iii.    *Conditional Provisional Ballot*

14   If the voter presents only one form of non-photo identification or does not present any

15   form of identification, the voter is issued a conditional provisional ballot.  Id. at 129, 135.

16   If the voter casts the conditional provisional ballot, the voter must present proof of

17   identification at certain designated locations within three-to-five days after the election,

18   depending on the type of election.  Id. at 135.

19

D.    Availability and Cost of Proof of Citizenship

20

i.    *Arizona Driver License and Non-Operating Identification Card*

21   A new Arizona driver license costs: $25.00 if the driver is between the ages 16 and

22   39; $20.00 if the driver is between the ages of 40 and 44; $15.00 if the driver is between the

23   ages 45-49; and $10.00 if the driver is age 50 or older.  (Ex. 676).  A replacement or

24   duplicate license costs $4.00.  Id.

25   An Arizona non-operating identification card costs $12.00.  Arizona Dep't of Transp.,

26   Motor Vehicle Div. ("MVD"), Frequently Asked Questions ("MVD FAQ") (last visited Aug.

27   3, 2008), http://www.azdot.gov/mvd/faqs/scripts/faqs.asp?section=dl#5. For persons age 65

28

1    or older, or anyone receiving federal Supplemental Security Income disability payments,
2    there is no fee.  A.R.S. § 28-3165(J); MVD FAQ.

3         Approximately 90% of voting-age Arizona citizens possess an Arizona driver's
4    license.  (Trial Tr. 706).  There was no evidence regarding what portion of the remaining
5    10% had other forms of photo identification, including Arizona non-operating identification
6    cards.

7         In order to obtain a new Arizona driver's license or non-operating card, an applicant
8    must present identification consisting of either: (1) two documents, one of which has a
9    photograph, or (2) three documents with no photograph.  Arizona Dep't of Transp., MVD,
10   Identification Requirements (last visited Aug. 4, 2008),
11   http://mvd.azdot.gov/mvd/formsandpub/viewPDF.asp?lngProductKey=1410&lngFormInf
12   oKey=1410.  In either case, one of the documents must be considered a "primary" document.
13   Id. (listing acceptable primary and secondary documents).

                              ii.    *Birth Certificate*

15        In Arizona, a replacement birth certificate and a delayed birth registration costs
16   $10.00.  (Ex. 672, 675).  To obtain a delayed birth certificate for a child who is 1-14 years
17   of age, the following documentation must be provided: (1) an affidavit by someone with
18   personal knowledge of when and where the child was born; (2) a document by an unrelated
19   person that was established before the child was five years old stating the child's name, date
20   of birth, place of birth, and the date the document was created; and (3) an independent factual
21   document that establishes the mother's  presence in Arizona at the time of the child's birth
22   stating the mother's name, street address and date the document was created.  (Ex. 672).

23        To obtain a delayed birth certificate for a child who is 15 years of age or older, the
24   following documentation must be provided: (1) an affidavit by someone with personal
25   knowledge of when and where the child was born; (2) a document by an unrelated person
26   that was established before the child was ten years old stating the child's name, date of birth,
27   place of birth, and the date the document was created; (3) an independent factual document

28

that was established at least five years prior to the application date stating the child's name, date of birth, place of birth, and the date the document was established; and (4) an independent factual document that establishes the mother's presence in Arizona at the time of the child's birth stating the mother's name, street address and date the document was created. <u>Id.</u> In other states, the cost and means of obtaining a birth certificate varies. (<u>See</u> Ex. 673).

### iii.   *Passport*

The cost for obtaining a passport book or card is $100 and $45, respectively.  Dep't of State, Passport Fees (last visited Aug. 3, 2008), http://travel.state.gov/passport/get/fees/fees_837.html.

### iv.   *Certificate of Naturalization*

A replacement certificate of naturalization costs $380.  Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Instructions for N-565, Application for Replacement Naturalization/Citizenship Document (last visited Aug. 3, 2008), http://www.uscis.gov/files/form/N-565instr.pdf.

### v.   *Bureau of Indian Affairs Card, Tribal Treaty Card, or Tribal Enrollment Card*

Bureau of Indian Affairs and tribal treaty cards are not in use in Arizona.  (Trial Tr. 474-75).

All tribes in Arizona, except the Havasupai Tribe and Navajo Nation,[9] issue tribal enrollment cards.  (<u>Id.</u> at 483, 486; Ex. 1325).  Cards issued by the Hopi Tribe, Yavapai-Apache Nation, and Tonto Apache Tribe do not include enrollment numbers.  (Ex. 1325).

Tribal enrollment cards are free for most tribes.  For the Hopi Tribe, the first card is free, and an additional card is $15.  <u>Id.</u>  For the Yavapai-Apache Nation, a card costs $5.00.

---

[9] Navajo Nation is not a member of the Inter Tribal Council of Arizona, Inc., and was represented by separate counsel in this litigation. <u>See</u> <u>Navajo Nation v. Brewer</u>, CV 06-1575. It did not challenge Proposition 200's proof of citizenship requirement. (<u>See</u> Trial Tr. 483-84).

Id.  And for the Colorado River Indian Tribe, the first card is free, and an additional card is $12.00.  Id.

E.      Verification of Proof of Citizenship

Photocopies of birth certificates, photocopies of U.S. Passports, tribal identification numbers, and naturalization certificates presented in person or via photocopy are accepted on their face without subsequent verification.  (Ex. 4 at 48; Trial Tr. 700-01; Rodriguez Dep. 86-87, Jan. 22, 2008; Dean-Lytle Dep. 50, Jan. 16, 2008; Osborne Dep. 38-39, 50, Jan. 14, 2008; Wayman-Trujillo Dep. 63-65, Jan. 9, 2008; Rodriguez Dep. 68, 87, Jan. 22, 2008; Dean-Lytle Dep. 50, Jan. 16, 2008; Osborne Dep. 50, Jan. 14, 2008; Kanefield 19-21, Jan. 11, 2008; Marin Dep. 45-47, 113, Jan. 18, 2008).

A-numbers are verified using USCIS's online system called the Systematic Alien Verification for Entitlements Program (SAVE).  (Ex. 4 at 47; Trial Tr. 735).

Driver's licenses and non-operating identification cards are verified using the Secretary of State's online voter registration system, VRAZ,[10] which collects voter registration information from the counties and compares the information about the registrants and existing voters against the MVD database.  (Exs. 38, 165, 167, 307.)

VRAZ flags applicants whose Arizona driver's licenses were issued before October 1, 1996 or are coded "Type F." (Exs. 126, 153, 175).  One thousand three hundred applicants were unable to register online due to attempts to use a license issued before October 1, 1996 or a Type F license.  (Kanefield Dep. 30-31, Jan. 11, 2008).  It is unclear how many of these applicants were subsequently able to register.

Since 1996, before issuing an Arizona license, the MVD has verified lawful presence, and, since 2000, it has issued Type F licenses to non-citizens who establish lawful presence.  (Yanofsky Dep. 14, 34, Jan. 10, 2008).  Thus, even though MVD is not charged with

---

[10] VRAZ also checks voter registration information against the Social Security Administration database, as well as Arizona death records and records of felony convictions. (Exs. 38, 165, 167, 307).

monitoring citizenship, and even though some older licenses belonging to non-citizens may not be coded Type F, there is a reasonable relationship between the type of license issued and a person's citizenship status.

Because a license does not reflect whether it is Type F on its face, a recently naturalized citizen who uses a Type F license to register to vote may have to provide additional proof of identification. (Ex. 175). In such circumstances, a naturalized citizen has the option of obtaining an updated license by presenting a naturalization certificate to the MVD and pay a fee of $4, or registering to vote without incurring additional cost using a naturalization certificate. (Yanofsky Dep. at 65-66; Gage Dep. 90, Jan. 10, 2008).

F.      Impact of Proposition 200

i.      *Proof of Citizenship Requirement*[11]

Between January 2005 and September 2007, the number of applicants in 14 of Arizona's 15 counties[12] unable (initially) to register to vote because of Proposition 200 was 31,550.[13]  (Ex. 883, Table 1; Trial Tr. 246).

Of these applicants, Plaintiffs' expert, Dr. Louis Lanier, estimated that 5,258, or 16.7%, were Latino, which was 2.8% higher than their representation in total number of registration applicants.  (Ex. 883, Table 2). To arrive at this estimate, Dr. Lanier used a list of Latino surnames compiled by the U.S. Census Bureau known as the "Passel-Word List."  (Trial Tr. 242).  This list divides surnames into five categories based on the probability that they represent a Latino person.  Id.  Dr. Lanier assumed names listed as "heavily Hispanic" and "generally Hispanic" were surnames for Latino persons for purposes of his analysis.  Id. Defendants' expert, Dr. Jeffrey Zax, did not assert that use of the Passel-Word List was an inappropriate means of predicting whether a person is Latino.  (Trial Tr. 800).

---

[11] ITCA Plaintiffs' expert, Dr. Ronald Sissons, testified in his deposition that 2% of Arizona's non-registered, voting eligible population did not have proof of citizenship. (Sissons Dep. 9, 10, Aug. 11, 2006).  His deposition testimony was admitted at trial by stipulation of the Parties.  (Doc. 1014).

Dr. Sissons testified to the same at the preliminary injunction hearing. (Prelim. Inj. H'rg Tr. 138-39, Aug. 30, 2006).  The Court, however, did not then find this testimony reliable, and the Court does not find it reliable here. (See Doc. 219 at 9 ("The Court has reservations regarding the reliability of [Dr. Sisson's] statistics."); id. at 10 ("[T]he Court was not presented with sufficiently reliable information regarding the number of voters that do not have adequate forms of identification.")).

[12] This number does not include rejected voter registration forms from Santa Cruz County, which did not produce any forms, and did not include a portion of the rejected forms from Yuma County.  (Trial Tr. 246-47).

[13] This number is exclusive of duplicate forms, forms with missing information, forms with "no" in the U.S. citizenship field, and forms with a registration date prior to January 1, 2005.  (Trial. Tr. 242).  The total inclusive of these forms is about 38,000.  Id.

1   Most rejected applicants listed their birthplace in the United States: 86.6% of Latinos,

2   and 92.9% of non-Latinos. (Ex. 885, Table 3).

3   By comparing the names on rejected voter registration forms to the voter rolls, Dr.

4   Lanier determined if an applicant, initially unsuccessful, was ultimately able to register to

5   vote through a later successful application. (Trial Tr. 244). Of the 31,550 applicants initially

6   unable to register to voter, approximately 11,000, or 30%, were subsequently able to register

7   to vote. (Trial Tr. 329). Of the approximately 20,000 applicants unable to register to vote,

8   4,013, or about 20%, were Latino. (Ex. 884, Table 2; Trial Tr. 835-36).

9   Assuming that everyone prevented from registering by Proposition 200 was allowed

10  to register, i.e., Proposition 200 had not gone into effect, Dr. Lanier predicted that 13.8% of

11  the electorate would have been Latino. (Ex. 883, Table 4). Using Dr. Lanier's data, Dr. Zax

12  calculated the percentage of the electorate that was Latino with Proposition 200 in effect as

13  13.7%—a difference of 0.1%. (Trial Tr. 799). Using the same data and incorporating Dr.

14  Engstrom's turnout date, Dr. Zax also calculated what the Latino voter turnout would have

15  been in the 2006 general election for Secretary of State with and without Proposition 200.

16  Id. at 831.    The difference in the Latino voter turnout was 0.06%.    Id.

17  Plaintiff's expert Dr. Rodolfo Espino examined the effects of Proposition 200 on the

18  flow of voter registrations in Arizona and its individual counties. He examined the 941 days

19  before and after the implementation of Proposition 200. (Trial. Tr. 377). Both Latinos and

20  non-Latinos experienced a drop in their registration rates following the implementation of

21  Proposition 200 when compared to the period before Proposition 200. (Trial Tr. 391). This

22  drop is not unexpected because the period before Proposition 200 included the 2004

23  Presidential election, which was accompanied by a drastic increase in the number of voter

24  registrations. (Ex. 879, Chart 1[14]).

25  _____

26  [14] Although Dr. Lanier, no longer relied upon the expert report in which this chart is
    included in reaching his conclusions in this case, (Trial Tr. 271), the Court finds reliable the

27  portion of Chart 1 that reflects actual voter registrations, as opposed to predicted voter

28

Statewide, the percent drop in number of individuals registered to vote per week was 36.67% for Latinos and 35.75% for non-Latinos, a difference of 0.92%. (Trial Tr. 411; Def. Imp. Ex. 2, Table 3). On a county-by-county basis, the percent drop for Latinos was greater than that of non-Latinos in seven of Arizona's fifteen counties, specifically Apache, Gila, Graham, Greenlee, Pima, Santa Cruz, and Yuma. (Def. Imp. Ex. 2, Table 4; Trial Tr. 432-33). Examining the percent change in weekly registration rates before and after Proposition 200 based upon the regression slope, the decline in the rate of Latinos becoming registered to vote was worse than non-Latinos in five of fifteen counties, specifically Apache, Greenlee, Pima, and Santa Cruz. (Trial Tr. 421-23; Ex. 877, Table 1).

ii.   *Proof of Identification*

In the 2006 primary, 2006 general, and the 2008 Presidential preference elections, 3,135,951 ballots were cast. (Trial Tr. 683-84). Of these, 4,194 ballots, or 0.13%, were uncounted due to lack of proof of identification. (Trial Tr. 318). Of the uncounted ballots, 461, or 11%, were Latino. Id. As of September 2007, Latino represented 12.3% of registered voters. (Ex. 886).

Regarding the 2006 general election for Governor specifically, Dr. Lanier estimated that Latinos comprised between 2.6% and 4.2% of the voters who turned out that day, but Latinos cast 10.3% of ballots that went uncounted because of insufficient identification. (Ex. 886).

Regarding the 2008 presidential preference election, in a non-scientific study, Maricopa County reported, of 897 conditional provisional ballots, 739 went uncounted. (Ex. 954). Of the 739 uncounted ballots, 129, or 17%, were Latino. Id. Maricopa County further noted that 12% of its registered voters were Latino. Id.

**VI.   Evidence of Voter Fraud in Arizona**

registrations.

In 2005, Maricopa County Recorder Helen Purcell referred 159 matters to the Maricopa County Attorney Andrew Thomas based on evidence that non-citizens had registered to vote. (Osborne Dep. Ex. 3 at 4, July 31, 2006). In August 2005, Thomas announced that ten non-citizens had been charged in felony criminal complaints for falsely filing voter registration forms claiming they were in fact United States citizens, four of which had voted in an election. Id.

Maricopa County Elections Director Karen Osborne also testified to voter registration organizations, which are paid on a per-registration-form basis, submitting "garbage" voter registration forms and misleading non-citizen residents into registering to vote. (Osborne Dep. 16-28, 18-30, 70, Jan. 14, 2008).

In Pima and Maricopa counties, 208 individuals had their voter registrations cancelled after they swore under oath to the Jury Commissioner that they were not citizens, 56 of whom are alleged to have voted in a election. (Exs. 1108, 1351).

Pima County has also referred several instances of non-citizens either attempting to register to vote or cast votes to the Pima County Attorney. (Ex. 1108 at 2-3 & ex. A).

Yuma County Voter Registration Coordinator Krysty Marin testified that a woman who was not a citizen and who registered to vote right before the 2004 election. (Marin Dep. 98-99, 101-04, Jan. 18, 2008). Yuma County was able to identify her as a non-citizen because her license subsequently showed up as Type F. Id. at 98. Fortunately, she did not vote and has since cancelled her voter registration. Id. at 102. After talking with this woman, Marin believes she was a victim of an unscrupulous voter registration organization. Id. at 99, 103.

In addition, Defendants have introduced court records for nine persons prosecuted for illegal voting and presentment of false instrument for filing. Ex. 1349a-g,y-z. According to

1    the charging papers, five of the nine were alleged to be non-citizens that had in fact voted.[15]

2    Ex. 1349a,c,d,e,f,g.  Of the five, four pleaded guilty.  Id.

3    **V.    Plaintiffs**

4         A.    <u>Gonzalez</u>

5              i.    *Individual Plaintiffs*

6         There are four individual plaintiffs: Jesus Gonzalez, Bernie Abeytia, Georgia

7    Morrison-Flores, and Debra Lopez.[16]  Abeytia did not testify at trial.

8                        a.    Jesus Gonzalez

9         Jesus Gonzalez was born in Mexico and is Latino.  (Trial Tr. 221-22).  He became a

10   naturalized citizen on August 18, 2005. (<u>Id.</u>; Ex. 711).  After the naturalization ceremony,

11   he applied to register to vote using the number from his certificate of naturalization, rather

12   than his alien registration number, as proof of citizenship, which is what the voter registration

13   form at the time required.  (Trial Tr. 222-23; Ex. 712).

14        His application was denied for failure to provide proof of citizenship.  (Ex. 712).[17]

15   The letter of denial specified that satisfactory evidence of citizenship included the A-number

16   on the naturalization certificate.  Id.  Jesus Gonzalez's naturalization certificate bears a series

17   of numbers beginning with an "A."  (Ex. 711).  In addition, attached to the letter was Jesus

18   Gonzalez's voter registration application with his certificate of naturalization number crossed

19   out, and a notation "A#" written above.

20

21

22        [15] The act of registering to vote by a non-citizen is a class six felony.  A.R.S. §§ 16-

23   182, 39-161.  If that person also votes, the offense is a class five felony. A.R.S. § 16-1016.

24        [16] Naeem Abdul-Kareem, Luciano Valencia, and Maria Gonzalez were dismissed on

25   June 27, 2008.  (Doc. 883).

26        [17] Although the trial exhibit was in English, and Jesus Gonzalez cannot read English,

27   he testified that the letter arrived in Spanish (for an example, <u>see</u> Ex. 697) and in English.
     (Trial Tr. 230).

28

1    In October 2006, Jesus Gonzalez tried to register again online at EZ Voter

2 Registration, https://servicearizona.com/webapp/evoter/, using his Arizona driver's license.

3 (Trial Tr. 220, 225, 235). His application was denied because his Arizona driver's license

4 was issued to him before October 1, 1996. <u>Id.</u> at 225.

5    Jesus Gonzalez has a U.S. passport, issued November 8, 2006, which he purchased

6 for $112.95. (Exs. 709-10). He purchased the passport to travel to and from Mexico, rather

7 than to register to vote. (Trial Tr. 232).

8    There is no dispute that Jesus Gonzalez possess the documentation required to

9 establish proof of citizenship to register vote—he has a naturalization certificate with an A-

10 number and a U.S. passport.

11                    b.    Georgia Morrison-Flores

12    Morrison-Flores was born in Yuma, Arizona. (Morrison-Flores Dep. 12, Jan. 17,

13 2008). She got married on July 5, 2003. <u>Id.</u> Prior to her marriage, her name was "Georgia

14 Morrison-Vasquez." <u>Id.</u> at 14. She registered to vote in 2004 under the name "Georgia

15 Flores-Morrison." <u>Id.</u> at 34, 36-38, 41-42. It appears that she accidentally filled out the form

16 incorrectly: it should read "Georgia Morrison-Flores." <u>Id.</u> at 41-42; <u>see also</u> Doc. 617, Ex.

17 21. There is no evidence that she has tried to correct her name on the voter rolls.

18    Morrison-Flores receives monthly bank statements from SunBank. <u>Id.</u> at 22-23. She

19 also still has the voter registration card that she received from the Yuma County elections

20 department after registering to vote in 2004. <u>Id.</u> at 41, 77. She also has received sample

21 ballots from Yuma County. <u>Id.</u> at 65.

22    On November 7, 2006, she attempted to vote at her polling place using her license

23 as proof of identification, but was not allowed to because the name on her license at the time

24 was "Georgia Morrison-Vasquez," which did not match the name on the voter rolls, "Georgia

25 Flores-Morrison." <u>Id.</u> at 43-44. She was not offered a provisional ballot. <u>Id.</u> at 45-46.

26

27

28
                                    - 18 -

In April 2007, she went to an office of the MVD and updated her name in their records to reflect her married name.  Id. at 48-49.  Morrison-Flores' current drivers' license reads "Georgia Morrison-Flores."  Id. at 51.

Morrison-Flores can correct the name on the voter rolls for free.  Once she does this, she has the proof of identification required in order to vote in person on election day.

### c.   Debra Lopez

Lopez is a consultant, creating grass-root strategies for non-profit political and corporate clients.  (Trial Tr. 605).  For example, she worked for the Latino Vote Project and the Southwest Voter Registration Education Project.  Id. at 619.  She has been registering voters since she was 18 years old, as part of her employment and on a volunteer basis, and does so every chance that she gets.  Id. at 606.  She volunteers at festivals and fiestas, and conducts impromptu registration using registration forms she keeps in her car.  Id.  She focuses on registering Latino voters.  Id. at 607.  She herself is registered to vote, and she possesses sufficient voter identification to vote in person on election day.  Id. at 617, 618.

Prior to Proposition 200, Lopez said she could register every person that wanted to register.  Id. at 610, 621.  After Proposition 200, it is more difficult for her because people she encounters sometimes do not carry the necessary documentation on their persons.  Id. at 612.  In addition, if the documents have to be photocopied, such as a birth certificate or passport, she has to bring a photocopy machine and rent a generator to run it.  Otherwise, she tries to obtain copies on the person's behalf, or to explain to the person how to obtain photocopies.  Id. at 612-13, 623.  Her personal expenditures related to Proposition 200 involved time, gas, and photocopies.  Id. at 622-23.

She did not identify any particular individuals who cannot register due to Proposition 200.

### ii.   *Organizational Plaintiffs*

The Gonzalez organizational plaintiffs include: Chicanos Por La Causa, Valle Del Sol, Association of Community Organizations for Reform Now, Arizona Hispanic Community

- 19 -

Forum, Friendly House,  Project Vote, Southwest Voter Registration Education Project, and Common Cause.  Only Chicanos Por La Causa and Valle Del Sol testified at trial.

a.      Chicanos Por La Causa ("CPLC")

Vice President of Human Resources Salvador Martinez testified on CPLC's behalf. (Trial Tr. 551-52).  CPLC is a statewide, community-based organization.  Id.  Its mission is to advocate on behalf of those individuals that are disenfranchised and to provide services for those unable to provide for themselves.  Id. at 552.  As part of that mission, it conducts voter registration, outreach, and education.  Id. at 552-53.

Martinez testified that Proposition 200 is "somewhat burdensome" on CPLC.  He stated that it has made voter registration more expensive because CPLC has to makes copies of registrants' documents, and more manpower is required.  Id. at 554-55.  In addition, Martinez testified that CPLC had to create and copy for distribution several documents because of Proposition 200 in order to educate CPLC's personnel and constituents about the new law's requirements.  Id. at 557-58; Exs. 538, 563, 566, 569, 570.  Only one of these documents, though, mentions Proposition 200's requirements.  (Ex. 538).

Martinez testified that CPLC incurred $7,000 related to copying, *et cetera*, and unspecified labor costs because of Proposition 200.  (Trial Tr. 566).  No documentation was provided supporting these costs, nor was there evidence that these costs were due to Proposition 200, as opposed to its general voting expenditures.

When registering voters, Martinez encountered only two people who wished to register, but did not have the requisite proof of citizenship on their person.  (Trial Tr. 559-60).  He did not testify that they did not have proof of citizenship, merely that they did not have it with them.  He instructed the first person to go home and return with the documents. Id. at 560.  The person did not return, and Martinez does not know if he ever registered to vote.  Id. at 561.  Martinez drove the second person home to obtain the documents because that person did not have transportation.  Id. at 560.  Martinez testified that one of these persons was Latino, but did not testify whether either was a member of CPLC.  Id. at 573.

b.     Valle Del Sol ("Valle")

President and Chief Executive Officer Luz Sarmina testified on behalf of Valle. (Trial Tr. 490-91). Valle is a nonprofit community based organization, which focuses its services on the Latino community. Id. at 490. Its mission is to inspire positive change through its behavioral health services, family support services, and Latino leadership development program. Id. at 490-91, 498. Although Valle seeks to promote civic engagement through voter registration, voter registration is not one of its core businesses. Id. at 492-93.

Sarmina testified that Proposition 200 has had "not a huge impact but an impact" on Valle. Id. at 498, 500. She stated that voter registration is more expensive post Proposition 200 because of the copying and additional staff time dedicated to training voter registrars and registrants. Id. at 498, 500, 514; see also Exs. 541-45. She also testified that, when trying to register voters, Valle has encountered people that did not have the necessary proof of citizenship on their person. (Trial Tr. 500). In such instances, Valle advised the person to get the documents and bring them back for photocopying, or, if the person did not have documentation, Valle worked with the person to try to get documentation. Id. at 501-02. In its interrogatory answers, Valle states that it has incurred $11,047 in costs due to Proposition 200, (Ex. 1304), but did not provide any supporting documentation at trial.

Sarmina did not testify that a member of Valle did not or does not now possess proof of citizenship.

B.     ITCA

i.     *Individual Plaintiff*: Representative Steve Gallardo

Representative Steve Gallardo has been a member of the Arizona House of Representatives since 2002. (Trial Tr. 175). He is the minority whip for the House Democrats, and is Latino. Id. at 175, 190. The district that he represents, District 13, comprises parts of the Cities of Glendale, Phoenix, Tolleson, and Avondale, and the community of Cashion. Id. at 175-76. The voting age population in his district is majority

1  Latino.  Id. at 176.  Representative Gallardo is running for reelection this year for another
2  two year term, and has qualified for the primary ballot.  Id.

3  Representative Gallardo has also been an at-large member of the Phoenix Union High
4  School Governing Board since 2004.  Tr. 176-77.  The high school district he represents
5  covers the City of Phoenix, which contains over a million people, and is majority Latino.  Id.
6  at 177.  Again, he is running for reelection this year for another four year term.  Id. at 177-78.

7  Representative Gallardo was reelected to his House seat in 2006—after the
8  implementation of Proposition 200.  Id. at 189.  Also he testified that, as a candidate, if he
9  wants his constituents to vote for him, he needs to notify them about the acceptable forms of
10 identification.  Id. at 186.  He is not aware, however, of any specific person who has been
11 unable to register to vote or that would vote for him but cannot because of Proposition 200.
12 Id. at 180, 198, 201.

13                    ii.    *Organizational Plaintiffs*

14 The ITCA organizational plaintiffs include: Inter Tribal Council of Arizona, Inc.,
15 Arizona Advocacy Network, League of Women Voters of Arizona, Hopi Tribe, and League
16 of United Latin American Citizens.  The Hopi Tribe and the League of United Latin
17 American Citizens did not testify.

18                    a.    Inter Tribal Council of Arizona, Inc. ("ITC")

19 Executive Director John Lewis testified on behalf of ITC.  (Trial Tr. 443-44).  ITC
20 comprises the highest elected tribal officials of 20 of the 22 tribes located in Arizona, not
21 including the Navajo Nation.  Id. at 444, 447; Ex. 1190.  Its purpose is to work collectively
22 on common issues that face them as tribal governments.  Id. at 444.  As part of that purpose,
23 ITC seeks to promote American Indian voting rights and provides voter education programs
24 for tribe members.  Id. at 444-45, 470-71.

25 He testified tribal members were less likely to possess birth certificates, especially
26 members over the age of 40, and driver's licenses due to lack of access to health care and
27 economic conditions.  (Trial Tr. 457-60, 472-74).

28

- 22 -

1    Lewis said, however, that neither he nor ITC was aware of any tribal member who

2    lacks satisfactory evidence of citizenship to register to vote.  <u>Id.</u> at 486-87, 489; <u>see also</u> Ex.

3    1311.

4                    b.    Arizona Advocacy Network ("AzAN")

5         Executive Director Linda Brown testified on AzAN's behalf.  (Trial Tr. 581).

6    AzAN's mission is to promote social, economic, and environmental justice by increasing

7    civic participation.  <u>Id.</u>  To advance its mission, AzAN conducts voter registration.  <u>Id.</u> at

8    582.

9         AzAN is affiliated with a national group called USAction Education Fund

10   ("USAction"), one of the nation's leading organizations in nonpartisan voter registration.

11   <u>Id.</u> at 584.  AzAN has a contract with USAction to register a certain number of voters; their

12   current goal is 5,000 voters for the 2008 Presidential election.  <u>Id.</u> at 584, 585.  AzAN is paid

13   by USAction based on the number of confirmed registrations.  <u>Id.</u> at 584.

14        AzAN spent $19,025 in polling place monitoring over the four elections held in 2006.

15   (Trial Tr. 588; Ex. 1223).  Brown personally monitored some polling places during two

16   elections, during which she offered voters a "voter bill of rights" drafted by AzAN,

17   describing, among other things, the proof of identification options.  (Trial Tr. 588).  AzAN

18   spent $2,298 in printing costs for the voter bill of rights.  (Ex. 1223).

19        Brown said that, because of Proposition 200, it takes more people more time to

20   register each voter as compared to a state without identification requirements.  <u>Id.</u> at 586.

21   For example, in AzAN's 2008 projected voter registration budget, the cost per voter

22   registered is estimated as between $9.28 and $12.21 in Arizona, as opposed to a typical state

23   where it is between $7.08 and $7.81 per voter registered, which is a total cost difference of

24   $11,000-22,000.  (Ex. 1223).  This reflects Brown's belief that, in Arizona, AzAN can

25   register 6-10 persons in a four-hour shift in Arizona, as opposed to 15-20 per shift in other

26   states.  (Trial Tr. 586).  As part of its efforts, AzAN also seeks to help recruit 120 poll

27

28                                              - 23 -

workers for the counties and conduct supplemental training focusing on Proposition 200's requirements. Id. at 602.

AzAN also has projected that it will spend $40,440 on election protection efforts for the 2008 general election. Id. Brown projected that all of this cost is attributable to Proposition 200. (Trial Tr. 601). This testimony is not particularly reliable, however, because AzAN conducted election related efforts before Proposition 200.

While conducting registration since Proposition 200's implementation, Brown encountered four people that were unable to register because they lacked proof of citizenship on their person. Id. at 583-84. She did not testify whether these people were members of AzAN.

c.     League of Women Voters of Arizona (the "League")

President Bonnie Saunders, Ph.D., testified on behalf of the League. (Prelim. Inj. H'rg Tr. 116, Aug. 30, 2006). One of the League's primary goals is to promote voter participation. Id. Prior to Proposition 200, it conducted voter registration drives at parents' night in local schools and other venues. Id. at 118-21. After Proposition 200, it did not register voters, but merely passed out voter registration forms. Id. at 122-23. The League decided it would not take responsibility for peoples' drivers license numbers or making photocopies of other identification documents. Id. Saunders did not testify as to whether any member of the League did not possess proof of citizenship.

**V.     Defendants**

Defendants comprise the State of Arizona, the Arizona Secretary of State, Jan Brewer, in her official capacity (collectively, the "State"), the County Recorder and County Director

1   of Elections of every county in Arizona in their official capacities[18] (collectively, the

2   "Counties").  (Doc. 352; <u>ITCA</u>, Doc. 1).

3   **VI.    Lay Testimony by Non-Parties**

4         A.    <u>Maria Gonzalez</u>

5         Maria Gonzalez is a former <u>Gonzalez</u> plaintiff; she was dismissed for lack of standing

6   on June 27, 2008.  (Doc. 883).  She was born in Mexico, and she became a naturalized citizen

7   on August 18, 2005.  (Trial Tr. 207; Ex. 715).  After the naturalization ceremony, she applied

8   to register to vote using the number from her certificate of naturalization, rather than her A-

9   number, as proof of citizenship, which was required by the voter registration form at the

10  time, now amended to allow the A-number.  (Trial Tr. 207; Ex. 711).

11        Her application was denied for failure to provide proof of citizenship.  (Ex. 697).  But

12  the letter she received in Spanish and English specified satisfactory evidence of citizenship

13  included the "A-number" on the naturalization certificate.    <u>Id.</u>   Maria Gonzalez's

14  naturalization certificate bears a series of numbers beginning with an "A."  (Ex. 715).  In

15  addition, attached to the letter was Maria Gonzalez's voter registration application with her

16  certificate of naturalization number crossed out, and a notation "A#" written above."  (Ex.

17  697).

18  ───────────────

19        [18] The specific persons are: Maricopa County Recorder Helen Purcell and Maricopa
    County Elections Director Karen Osborne; Apache County Recorder LeNora Johnson and
20  Apache County Elections Director Penny L. Pew; Cochise County Recorder Christine
    Rhodes and Cochise County Elections Director Thomas Schelling; Gila County Recorder
21  Linda Haught Ortega and Gila County Elections Director Dixie Mundy; Graham County
    Recorder Wendy John and Graham County Elections Director Judy Dickerson; Greenlee
22  County Recorder Berta Manuz and Greenlee County Elections Director Yvonne Pearson; La
    Paz County Recorder Shelly Baker and La Paz County Elections Director Donna Hale;
23  Mohave County Recorder Joan McCall and Mohave County Elections Director Allen
24  Tempert; Pima County Recorder F. Ann Rodriguez and Pima County Elections Director Brad
    R. Nelson; Santa Cruz County Recorder Suzie Sainz and Santa Cruz County Elections
25  Director Melinda Meek; Yavapai County Recorder Ana Wayman-Trujillo and Yavapai
26  County Elections Director Lynn A. Constabile; and Yuma County Recorder Susan
    Hightower Marler and Yuma County Elections Director Patti Madrill.

27

28                                    - 25 -

1    In October 2006, Maria Gonzalez attempted to register again at EZ Voter Registration,

2    https://servicearizona.com/webapp/evoter/, using her Arizona driver's license issued in 2005,

3    and was successful.  (Trial Tr. 214, 219-20).  Thus, she is registered to vote in the 2008

4    Presidential election.

5    B.    Agnes Laughter

6    Agnes Laughter is a former Navajo Nation plaintiff, which case was dismissed by

7    stipulation on May 27, 2008.  (Doc. 775).  She was born Jane Begay in Chilchinbeto, located

8    on the Navajo Nation reservation in Arizona.  (Laughter Dep. 9, Oct. 19, 2006).  She was

9    born at home in a hogan, and is 74 years old.  Id.  She is now registered to vote, id. at 14-15,

10   and has a certificate of Indian blood and a bank statement as voter identification.  (Doc. 435,

11   Ex. 9).  Therefore, Laughter can vote in person on election day.

12   C.    Shirley Preiss

13   Shirley Preiss, who, by stipulation, is not Latina, was born Shirley Meshew on August

14   17, 1910 in Clinton, Kentucky.  (Trial Tr. 82; 89-90).   She was born at home rather than a

15   hospital, and was not issued a birth certificate.  Id. at 83.  She did not testify that she is

16   American Indian.

17   Preiss moved to Arizona about three years ago.  Id. at 84.  She is cared for by her son

18   and has made efforts to register to vote in Arizona, but has been unsuccessful because she

19   does not possess the proof of citizenship required by Proposition 200.  Id. at 87.  She has

20   tried to obtain a delayed birth certificate from Kentucky, but has also been unsuccessful in

21   this pursuit.  Id. at 83.  She does not have an Arizona driver or nonoperating license, nor a

22   passport.  Id. at 87, 88.

23   D.    Donna Fulton

24   In late 2007, Fulton moved from Safford, Arizona in Graham County, where she was

25   a registered voter, to Eloy, Arizona in Pinal County.  (Ex. 968).  She did not testify whether

26   she is either Latina or Native American.  In December 2007, she completed a new voter

27   registration form and mailed it to the Pinal County Recorder's Office.  Id.

28

On February 5, 2008, Fulton attempted to vote in the Presidential preference primary election, but the poll worker could not find her name on the Pinal County voter roll.  Id. After showing proof of identification with her current address, Fulton cast a conditional provisional ballot.  Id.  She reports that the poll worker did not instruct her to return to the County Recorder's Office to provide her identification again.  Id.

Approximately one month after the election, Fulton received a letter in the mail stating that her ballot was not counted because she failed to provide proof of citizenship.  Id.

Assuming the veracity of Fulton's testimony, County Defendants state that Fulton should have been issued a provisional ballot, rather than a conditional provisional ballot, and her ballot was improperly not counted.  (Doc. 1031, at 4).

E.     Brenda Rogers

Rogers lives on the Gila River Reservation, and is registered to vote in Pinal County. (Ex. 967).  She did not testify whether she is either Latina or Native American.  Rogers' driver's license does not reflect her current address.  Id.  Although her home does not have a street address, her registered voter address is Gila River Dist 4B, Sacaton, Arizona 85247. Id.  Rogers receives mail at P.O. Box 13493, Chandler, Arizona 85248, which is also on her voter record.

On February 5, 2008, Rogers says she attempted to vote in the Presidential preference primary election.  Id.  She showed her voter registration card and driver's license.  Id. The poll workers found her on the voter rolls but said that she had to vote a conditional provisional ballot because the address on her driver's license did not match her registered voter address.  Id.  Rogers cast a conditional provision ballot.  Id.

Assuming the veracity of Rogers's testimony, County Defendants state that Rogers should have been issued a provisional ballot, rather than a conditional provisional ballot, and her ballot was improperly not counted.  (Doc. 1031, at 4).

1

**STANDARD OF REVIEW**

2      To secure a permanent injunction, "[a] plaintiff must demonstrate: (1) [] it has suffered

3    an irreparable injury; (2) [] remedies available at law, such as monetary damages, are

4    inadequate to compensate for that injury; (3) [] considering the balance of hardships between

5    the plaintiff and defendant, a remedy in equity is warranted; and (4) [] the public interest

6    would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 126

7    S.Ct. 1837, 1839 (2006).  This burden must be demonstrated by a preponderance of the

8    evidence.  Walters v. Reno, 145 F.3d 1032, 1048 (9th Cir. 1998).

9

**LEVEL OF SCRUTINY FOR CONSTITUTIONAL CLAIMS**

10   **I.      Constitutional Challenges to Election Laws Generally**

11     "It is beyond cavil that 'voting is of the most fundamental significance under our

12   constitutional structure.'"  Burdick v. Takushi, 504 U. S. 428, 433 (1992) (quoting Ill. Bd.

13   of Elections v. Socialist Workers Party, 440 U. S. 173, 184 (1979)).  Nonetheless, "'as a

14   practical matter, there must be a substantial regulation of elections if they are to be fair and

15   honest and if some sort of order, rather than chaos, is to accompany the democratic

16   processes.'"  Id. (quoting Storer v. Brown, 415 U. S. 724, 730 (1974)); see also U.S. Const.

17   Art. I, § 4, cl. 1 ("The times, places and manner of holding elections for Senators and

18   Representatives, shall be prescribed in each state by the legislature thereof . . . .").  "This

19   [regulatory] power is not absolute, but is subject to the limitation that [it] may not be

20   exercised in a way that violates . . . specific provisions of the Constitution.'"  Wash. State

21   Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1992 (2008) (quoting Williams v.

22   Rhodes, 393 U.S. 23, 29 (1968)).

23     Because of these competing interests, the Supreme Court has adopted a sliding-scale

24   balancing approach for analyzing election laws.  Crawford v. Marion County Election Bd.,

25   128 S. Ct. 1610, 1615-16 (2008); id. at 1624-25 (Scalia, J., concurring); id. at 1628 (Souter,

26   J., dissenting);  Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1191

27   (2008).  Election regulations that impose a severe burden on constitutional rights are subject

28

to strict scrutiny. Wash. State Grange, 128 S. Ct. at 1191. "If a statute imposes only modest burdens, however, then 'the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." Id. (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)). That said, if the state's interest is unrelated to voter qualifications, the regulation likely will be struck down no matter how slight its burden. See Crawford, 128 S. Ct. at 1615-16; Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966).

Finally, in applying this approach, the Court is reminded, "since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U. S. 533, 562 (1964).

## II.   Facial Versus As Applied Constitutional Challenges

Whereas a facial challenge seeks to invalidate a statute in all of its applications, an as applied challenge argues that the law is unconstitutional as applied to the plaintiff even though the law may be capable of valid application to others. See Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998) (discussing the difference between facial and as applied challenges).

Although the standard to be applied to a facial challenge is a subject of debate among the Justices of the Supreme Court, they do agree "a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" Crawford, 128 S. Ct. at 1623 (quoting Washington State Grange, 128 S. Ct. at 1190).

## ANALYSIS

## I.   Equal Protection: Undue Burden on the Fundamental Right to Vote

Plaintiffs, except the Hopi Tribe and ITC, assert Proposition 200's proof of citizenship and identification provisions impose an unconstitutional burden on the fundamental right to vote. The Hopi Tribe and ITC only challenge the proof of citizenship provision. ITCA

1    Plaintiffs' claims are facial and as-applied challenges, while Gonzalez Plaintiffs' claims are

2    as-applied challenges only.

3         A.    Strict Scrutiny is Not Appropriate.

4         Strict scrutiny of Proposition 200 is not warranted because Plaintiffs have failed to

5    demonstrate that the character and magnitude of the asserted injury excessively burdens the

6    right to vote.

7              i.    The Burden on Naturalized Citizens Is Not Excessive.

8         Gonzalez Plaintiffs assert that naturalized citizens suffer an excessive burden under

9    Proposition 200 because they have to "register twice or appear in person at the Recorder's

10   Office to register to vote." (Doc. 1033, at 6). To the extent that some applicants had to

11   register twice immediately following Proposition 200's implementation when they used their

12   naturalization certificate number to provide proof of citizenship, current and future applicants

13   do not.

14        Proposition 200 allows applicants to use "the number of the certificate of

15   naturalization" to register. A.R.S. § 16-166(F)(4). There are two numbers on a certificate

16   of naturalization, however: (1) a number with the heading "No."; and (2) a number with the

17   heading "INS Registration No.," which begins with the letter A. No system exists, on the

18   federal or state level, to verify the former. There is a federal system in place, SAVE, that

19   verifies the latter. Given the clear requirement of Proposition 200 to verify "the number"

20   with USCIS, id., election officials reasonably interpreted Proposition 200 to require an

21   applicant to provide the A-number. See A.R.S. § 1-221(B) ("Statutes shall be liberally

22   construed to effect their objects and to promote justice."); Berger v. City of Seattle, 512 F.3d

23   582, 597 (9th Cir. 2008) ("We give due consideration to the government's interpretation and

24   past application of its rule.").

25        Prior to realizing that the number with the heading "No." is not verifiable, the voter

26   registration forms revised immediately following Proposition 200's implementation asked for

27   the certificate of naturalization number. As a result, some applicants, such as Maria and

28

1    Jesus Gonzalez, who correctly filed out their voter registration form by providing the number

2    beginning with "No." were denied registration, and they had to try to register a second time.

3           The registration form, however, has now been revised to clearly require the A-number,

4    which is verifiable.  Thus, although some applicants unfortunately had to register twice

5    immediately following Proposition 200's implementation, current and future applicants will

6    not suffer the same impediment in the upcoming 2008 election.  See City of Los Angeles v.

7    Lyons, 461 U.S. 95, 105 (1983) (noting that a prospective injunction requires the threat of

8    future harm).  Again, a "[plaintiff] must show a very significant possibility of future harm

9    because he seeks injunctive relief."  Mortensen v. County of Sacramento, 368 F.3d 1082,

10   1086 (9th Cir. 2004) (internal quotation marks omitted).

11          Moreover, if a newly naturalized citizen uses a Type F license to register to vote and

12   is required to provide additional proof of citizenship, the applicant merely has to file a new

13   form to register using his or her A-number.  While inconvenient, this is hardly a severe

14   burden.  As the Supreme Court recently explained, "the inconvenience of making a trip to

15   the [Bureau of Motor Vehicles], gathering the required documents, and posing for a

16   photograph surely does not qualify as a substantial burden on the right to vote, or even

17   represent a significant increase over the usual burdens of voting."  See Crawford, 128 S. Ct.

18   at 1621.

19          Further, a naturalized citizen does not have to appear in person at the Recorder's

20   Office to register to vote.  An applicant may provide a license number, a photocopy of a U.S.

21   passport, or an A-number to register without appearing in person.

22          In addition, if the applicant elects to forgo these options and to instead use the

23   certificate of naturalization form to register to vote, several counties accept photocopies of

24   naturalization certificates.  (See Dean-Lytle Dep. 53, Jan. 16, 2008 (Pinal County); Marin

25   Dep. 112, Jan. 18, 2008 (Yuma County); Osborne Dep. 38-39, Jul. 1, 2006 (Maricopa

26   County); Hansen Dep. 27, Aug. 1, 2006 (Coconino County); Rodriguez Dep. 63, Aug. 2,

27   2006 (Pima County)).  Contrary to Plaintiffs' assertion, accepting a photocopy of a

28

1   naturalization certificate is not forbidden by the Manual.  (See Ex. 4, at 48).  The Secretary

2   of State's representative, Joseph Kanefield,[19] specifically testified that a county recorder is

3   not violating the Manual by accepting photocopies. (Trial Tr. 756).  Accordingly, it is the

4   applicant's choice to travel to the county recorder to present a naturalization certificate.

5           Naturalized citizens do not suffer an excessive burden due to Proposition 200.

6                   ii.     The Burden on Arizona Citizens as a Whole Is Not Excessive.

7           Of the approximately 20,000 voters ultimately unable to register to vote due to

8   Proposition 200's proof of citizenship requirement, Plaintiffs have not presented any reliable

9   evidence as to the number of these applicants or voting eligible persons generally who lack

10  sufficient proof of identification or are unable to attain it.  See Crawford, 128 S. Ct. 1620

11  ("The burdens that are relevant to the issue before us are those imposed on persons who are

12  eligible to vote but do not possess a current photo identification that complies with the

13  requirements of [the voter identification statute.").  Indeed, they have only produced one

14  person, Shirley Preiss, who is unable to register to vote due to Proposition 200's proof of

15  citizenship requirement.  Nor have they demonstrated that the persons rejected are in fact

16  eligible to register to vote.

17          Regarding Proposition 200's proof of identification requirement, Plaintiffs have not

18  produced a single person who lacks proof of identification.  In addition, individuals who lack

19  proof of identification may vote early without providing identification, even on the day of

20  the election itself.

21          Of the over 3 million ballots cast in the 2006 primary, 2006 general, and the 2008

22  Presidential preference elections, only 4,194 ballots, or 0.13%, were uncounted due to lack

23  of proof of identification.  County Defendants have admitted, two of these ballots, Fulton and

24  _____

25          [19] Joseph Kanefield is the Director of the Election Services Division of the Secretary
    of State's office. (Trial Tr. 644).  His testimony both at trial and deposition demonstrates the
26  significant efforts the Secretary of State's office has taken to liberally construe questions
    raised regarding the right of an elector to vote in favor of allowing the elector to vote.
27

28                                      - 32 -

1    Rogers, went uncounted by mistake, but Plaintiffs have not presented any evidence that the

2    remaining 4,192 persons were in fact eligible to vote.[20]

3          Very recently, in <u>Crawford</u>, the Supreme Court found that Indiana's voter

4    identification law did not deserve strict scrutiny.  128 S. Ct. at 1623.  Plaintiffs seek to

5    distinguish <u>Crawford</u> on the grounds that the plurality stated: "The fact that most voters

6    already possess a valid driver's license, or some other form of acceptable identification,

7    would not save the statute under our reasoning in <u>Harper</u>, if the State required voters to pay

8    a tax or a fee to obtain a new photo identification," essentially a poll tax.  <u>Id.</u> at 1620-21.

9    <u>Harper</u> involved a poll tax unrelated to voter qualifications and is distinguishable. 383 U.S.

10   at 666.  Proposition 200's requirements go directly to voter qualifications: whether a

11   registrant is a U.S. citizen, and whether an in person voter is who he or she says he or she is.

12   Moreover, as the dissent in <u>Crawford</u> noted, the "free" identification provided by Indiana is

13   a hollow promise, as obtaining the documents necessary to get the "free" identification

14   require the payment of a fee.  <u>See</u> 128 S. Ct. at 1631.  The Court is bound by the Ninth

15   Circuit's holding on appeal of this case that Proposition 200 is not a poll tax even though

16   some Arizonans may be required to spend money to obtain necessary documents.[21]

17   <u>Gonzalez</u>, 485 F.3d at 1048.

18         Proposition 200's burden on Arizona citizens as a whole is not excessive.

19                        *              *              *

20   _____

21   [20] Although that Defendants admit that mistakes occurred and can occur in applying

22   Proposition 200 at the polls, especially when it was new, they endeavor to "make it very clear
     to poll workers that under no circumstances is someone ever to be turned away from the polls

23   without voting." (Trial Tr. 728).  In addition, if it was brought to their attention that a poll
     worker misunderstood or was misapplying Proposition 200's requirements, they quickly tried

24   to remedy the problem. <u>Id.</u>; Ex. 409.

25   [21] The Court is also bound by its prior holding that Proposition 200 does not constitute

26   a poll tax.  <u>See</u> <u>Ingle v. Circuit City</u>, 408 F.3d 592, 594 (9th Cir. 2005) ("Under the law of
     the case doctrine, a court is generally precluded from reconsidering an issue previously

27   decided by the same court, or a higher court in the identical case."); Docs. 611 & 330.

28                                         - 33 -

Because neither the burden on naturalized citizens nor Arizonans generally is excessive, Plaintiffs' challenges are not subject to strict scrutiny.  See id. at 1623.

B.    Defendants' Interests in Prevention of Voter Fraud and Maintaining Voter Confidence in the Electoral System Are Important.

Defendants have asserted two interests to justify Proposition 200's burden on voters and potential voters: (1) prevention of voter fraud; and (2) maintaining voter confidence.

a.    Voter Fraud

Although an evidentiary showing of fraud is not required to find a government's interest in preventing voter fraud to be important, id. at 1617 (deterring in person voter fraud an important state interest despite no evidence of fraud occurring in Indiana), the Defendants demonstrated instances of voter fraud in Arizona.  See supra, Section V.  In addition, in Crawford, the Supreme Court detailed examples of voter fraud in other states, supporting Defendants' assertion that voter fraud is a legitimate and real concern.  128 S. Ct. at 1619.

As the Supreme Court explained:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

Id.; see also Purcell, 549 U.S. at 7  ("A state indisputably has a compelling interest in preserving the integrity of its election process.").

Defendants' interest in preventing voter fraud is an important governmental interest in Arizona.

b.    Voter Confidence

Defendants also assert that they have an interest in protecting voter confidence in the electoral system.  "While that interest is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process."  Id. at

1    1620; <u>see also</u> <u>Purcell</u>, 549 U.S. at 7  ("Confidence in the integrity of our electoral process
2    is essential to the functioning of our participatory democracy.").

3          Defendants' interest in protecting voter confidence is an important governmental
4    interest in Arizona.

5          C.    <u>Defendants' Important Interests Outweigh the Modest Burden on the Right to
               Vote Imposed by Proposition 200.</u>
6
7          Because Plaintiffs have not demonstrated that Proposition 200 is excessively
     burdensome, "the State's important regulatory interests are [] sufficient to justify reasonable,
8
     nondiscriminatory restrictions' on election procedures." <u>Wash. State Grange</u>, 128 S. Ct. at
9
10   1191 (internal quotation marks omitted); <u>see also</u> <u>Crawford</u>, 128 S. Ct. at 1623.

11         Proposition 200 enhances the accuracy of Arizona's voter rolls and ensures that the
12   rights of lawful voters are not debased by unlawfully cast ballots.  <u>See</u> Commission on
     Federal Election Reform, Report, Building Confidence in U.S. Elections 18 (Sept. 2005)
13
     ("The electoral system cannot inspire public confidence if no safeguards exist to deter or
14
15   detect fraud or confirm the identity of voters.").  As such, Plaintiffs' challenge must fail. <u>See</u>
     <u>Crawford</u>, 128 S. Ct. at 1623; <u>id.</u> at 1627 (Scalia, J., concurring in the judgment).
16
17   **II.    Equal Protection: Discrimination Against Naturalized Citizens**

18         Gonzalez Plaintiffs contend Proposition 200's proof of citizenship requirement
19   violates the Equal Protection Clause by discriminating against naturalized citizens.  To
     establish an equal protection claim for discrimination, "a plaintiff must show that the
20
     defendants acted with an intent or purpose to discriminate against the plaintiff based upon
21
22   membership in a protected class." <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 686 (9th Cir.
     2001).  To show intentional discrimination, "a plaintiff must establish that 'the
23
     decision-maker . . . selected or reaffirmed a particular course of action at least in part
24
25   'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."
     <u>Rosenbaum v. City and County of San Francisco</u>, 484 F.3d 1142, 1153 (9th Cir. 2007)
26
27   (quoting <u>Wayte v. United States</u>, 470 U.S. 598, 610 (1985)); <u>see also</u> <u>Thornton v. Ctiy of St.</u>

28                                        - 35 -

1    Helens, 425 F.3d 1158, 1167 (9th Cir. 2005) ("Mere indifference to the effects of a decision

2    on a particular class does not give rise to an equal protection claim.").

3         Gonzalez Plaintiffs offer only three facts to show discriminatory intent.[22]   First,

4    Proposition 200's "findings and declaration" state:

> This state finds that illegal immigration is causing economic hardship to this state and
> that illegal immigration is encouraged by public agencies within this state that provide
> public benefits without verifying immigration status. This state further finds that
> illegal immigrants have been given a safe haven in this state with the aid of
> identification cards that are issued without verifying immigration status, and that this
> conduct contradicts federal immigration policy, undermines the security of our
> borders and demeans the value of citizenship.  Therefore, the people of this state
> declare that the public interest of this state requires all public agencies within this
> state to cooperate with federal immigration authorities to discourage illegal
> immigration.

Ex. 1.  Second, Proposition 200 allows photocopies of an applicant's birth certificate and

passport, but not certificate of naturalization.  Id.  And third, Proposition 200 states, "if only

the number of the certificate of naturalization is provided, the applicant shall not be included

in the registration rolls until the number of the certificate is verified . . . ."  Id.

         However, these facts do not establish intentional discrimination by a preponderance

of the evidence.  Proposition 200's findings and declaration does not demonstrate that the

voters in Arizona approved Proposition 200 because of its adverse effects upon naturalized

citizens.  Rather, the findings and declaration shows a concern with illegal immigrants, not

with naturalized citizens.  Moreover, unlike a finding or declaration in a bill vetted by

Congress, Arizona voters did not have any input into its specific language, which weakens

its evidentiary value as to the electorate's intent.  Cf. Arlington Cent. School Dist. Bd. of

Educ. v. Murphy, 548 U.S. 291, 312-13 (2006) (Souter, J., dissenting) (arguing that when

members of the House and Senate met in conference to work out differences and then

_____

[22] Although the admitted exhibits showed that, as anticipated problems, surfaced
regarding Proposition 200's implementation, the response by the State and County
Defendants was consistent and immediate.   There is no evidence of a purposeful
misapplication of Proposition 200's requirements or and intent to discriminate in its
application.

produced a joint conference report that was subsequently adopted by the Senate and House, it is probative of Congress's intent).

The second fact also fails to establish that Arizona voters approved Proposition 200 because of its adverse effects upon naturalized citizens. An applicant need only present the certificate of naturalization in person if the applicant chooses not to write down the A-number on the voter registration form. In fact, federal law criminalizes the photocopying of certificates of naturalization without lawful authority. 18 U.S.C. § 1426(h).[23]

Finally, Plaintiffs argue that the third fact evidences discriminatory intent because "only naturalized citizens are subject to third-party verification." (Doc. 1029, at 4). This is not strictly true because naturalized citizens can use their driver's license or passport to register to vote, and, if they present their naturalization certificate in person, verification is not required.[24]

Importantly, the Help America Vote Act already requires Arizona driver's licenses to be verified, so there was no need to so specify in the text of Proposition 200. See 42 U.S.C. § 15483(b)(5). And, indeed, when an applicant provides a license number, the

---

[23] 18 U.S.C. § 1426 (h) provides:
Whoever, without lawful authority, prints, photographs, makes or executes any print or impression in the likeness of a certificate of arrival, declaration of intention to become a citizen, or certificate of naturalization or citizenship, or any part thereof - Shall be fined under this title or imprisoned not more than 25 years (if the offense was committed to facilitate an act of international terrorism (as defined in section 2331 of this title)), 20 years (if the offense was committed to facilitate a drug trafficking crime (as defined in section 929(a) of this title)), 10 years (in the case of the first or second such offense, if the offense was not committed to facilitate such an act of international terrorism or a drug trafficking crime), or 15 years (in the case of any other offense), or both.

[24] For example, the counties often, if not always, attend naturalization ceremonies. If a naturalized citizen seeks to register after the ceremony and presents his or her naturalization certificate as proof of citizenship, the document is accepted on its face, and no further verification with USCIS is required.

1   application is not included on the voter rolls until the license is verified using Arizona's

2   online system. (Trial Tr. 655-56).

3       Of course, alien registration numbers have to be verified with a third party—the

4   federal government is the only entity that possesses such information.  In contrast, county

5   recorders can verify Arizona driver's licenses using their own system, which has not been

6   proven to be unreliable.

7       Moreover, applicants who wish to use their certificate of naturalization have more

8   options than applicants who use birth certificates or passports.  Applicants who rely on a

9   birth certificate or passport as proof of citizenship do not have the option of merely providing

10  a number, but must incur the cost of photocopying the birth certificate.  However, persons

11  with a certificate of naturalization are allowed to prove citizenship by either: (1) presenting

12  the actual certificate of naturalization, or (2) submitting the number on the naturalization

13  certificate, subject to verification.

14      The purpose of Proposition 200 – preventing voter fraud and enhancing voter

15  confidence – would be frustrated if naturalization numbers submitted without documentary

16  proof were not subject to verification.

17      Thus, regardless of the standard of scrutiny, because Gonzalez Plaintiffs have failed

18  to establish intentional discrimination, they have not proved that Proposition 200's proof of

19  citizenship requirement violates the Equal Protection Clause by discriminating against

20  naturalized citizens.

21  **III.   First Amendment**

22      Gonzalez Plaintiffs assert that Proposition 200's proof of citizenship requirement, as

23  applied, curtails their speech and associational rights in violation of the First Amendment by

24  making it harder and more expensive to register people to vote.

25      There is no question that voter registration efforts are protected by the First

26  Amendment.  See Bernbeck v. Moore, 126 F.3d 1114, 1117 (8th Cir. 1997); Monterey

27  County Democratic Cent. Comm. v. U.S. Postal Service, 812 F.2d 1194, 1196 (9th Cir.

28

- 38 -

1986); Project Vote v. Blackwell, 455 F. Supp. 2d 694, 706 (N.D. Ohio 2006).  As the Supreme Court explained in McConnell v. Federal Election Commission:

> Common sense dictates . . . that a [group]'s efforts to register voters sympathetic to that [group] directly assist the [group]'s candidates for federal office. . . . It is equally clear that federal candidates reap substantial rewards from any efforts that increase the number of like-minded registered voters who actually go to the polls.

540 U.S. 93, 167-68 (2003) (citations omitted).

Proposition 200, however, does not regulate voter registration organizations, and Plaintiffs are still able to disseminate their views to the public without restriction. Accordingly, Proposition 200 does not "necessarily reduce[] the quantity of expression." Buckley v. Valeo, 424 U.S. 1, 19 (1976); see also Meyer v. Grant, 486 U.S. 422-23 (1988).

Importantly, none of the Gonzalez Plaintiffs testified that Proposition 200 is a severe burden on their First Amendment rights.  (See Trial Tr. 554-55 (Proposition 200 is "somewhat burdensome on CPLC"); id. at 514 (Proposition 200 has "not [had] a huge impact" on Valle)).

Because Proposition 200 imposes only a modest burden on Gonzalez Plaintiffs' First Amendment rights, Defendants' important regulatory interests, discussed supra, Part I(B), are sufficient to justify the asserted burden.

**IV.    Section 2 of the Voting Rights Act**

Gonzalez and ITCA Plaintiffs allege Proposition 200 violates Section 2 of the Voting Rights Act ("VRA") by abridging Latino voters' right to vote.  In addition, ITCA Plaintiffs allege that it also abridges the rights of American Indians.

Section 2 of the Voting Rights Act provides in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
>
> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation

by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .

42 U.S.C. § 1973.

Thus, to establish a Section 2 claim, a plaintiff must show that its members have less opportunity to: (1) participate in the political process; and (2) elect representatives of their choice. Chisom v. Roemer, 501 U.S. 380, 396 (1991).

The challenged voting practice need only result in discrimination on account of race. Farrakhan v. Washington, 338 F.3d 1009, 1015 (9th Cir. 2003); see also Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003). A plaintiff need not demonstrate discriminatory intent. Farrakhan, 338 F.3d at 1014 ("Congress amended Section 2 of the VRA in 1982 to relieve plaintiffs of the burden of proving discriminatory intent."); Smith v. Salt River Project Agr. Imp. and Power Dist., 109 F.3d 586, 594 (9th Cir. 1997) ("Section 2 requires proof only of a discriminatory result, not of discriminatory intent.").

In analyzing whether Section 2 has been violated, the Court may consider:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
(6) whether political campaigns have been characterized by overt or subtle racial appeals;
(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;
(8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;
(9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

- 40 -

1  Farrakhan, 338 F.3d at 1015 (quoting S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982

2  U.S.C.C.A.N. 177, 206-07) (the "Senate Factors"); see also Gingles, 478 U.S. at 36-37.

3      This list is not exclusive, nor do "any particular number of factors [need to] be proved,

4  or [] a majority of them point one way or the other."   Farrakhan, 338 F.3d at 1015 (quoting

5  S. Rep. No. 97-417 at 29).   Rather, "courts must consider how the challenged practice

6  'interacts with social and historical conditions to cause an inequality in the opportunities

7  enjoyed by black and white voters to elect their preferred representatives.'"  Id. (quoting

8  Thornburg v. Gingles, 478 U.S. 30, 47 (1986)). "[A] voting practice or procedure violates

9  the VRA when a plaintiff is able to show, based on the totality of the circumstances, that the

10 challenged voting practice results in discrimination on account of race."  Id. at 1017

11 (emphasis in original omitted).

12      A.    Latino Voters

13          i.    *Statistical Evidence of Disparate Impact*

14      Taking all of the expert testimony into consideration, Plaintiffs have not demonstrated

15 that Proposition 200 had a statistically significant impact.  It is true that the percent of Latino

16 voter registration applicants rejected was 2.8% higher than their representation in total

17 number of registration applicants, 19.8% of those ultimately unable to register to vote were

18 Latino, and the percent of Latino votes that go uncounted is higher than their representation

19 in the number of voters casting ballots.

20      Despite this seeming disparity, even if everyone prevented from registering by

21 Proposition 200 was allowed to register, the percentage of the electorate that was Latino

22 would only increase by 0.1%, and the difference in Latino turnout in the 2006 general

23 election for Secretary of State would have been even less, 0.06%.  Further, although the drop

24 in Latino registration rates was 0.92% more than the drop in non-Latino registration rates

25 following Proposition 200,  this could have been driven, at least in part, by the lower Latino

26 population growth in 2005-2006.

27

28                                          - 41 -

1    Dr. Zax credibly testified that these differences were not nearly large enough to be

2    statistically significant. (Trial Tr. 800-03). This is especially true in light of the fact that the

3    Passel-Word List, while a good estimate, is merely an estimator of Latino descent. Id. at 801.

4    Thus, when one considers the uncertainty as to the actual number of Latinos, minute

5    differences of less than one-tenth of one percent are subsumed by the uncertainty associated

6    with the original identification of who is and is not Latino. Id.

7    Thus, examining the facts as a whole, Proposition 200 does not have a statistically

8    significant disparate impact on Latino voters.

9                    ii.    *Senate Factors*

10   Factors not considered because no evidence was presented at trial are: use of voting

11   practices for discrimination; candidate slating process; racial appeals during political

12   campaigns; lack of responsiveness; and tenuousness of the voting practice.

13                    a.    History of Discrimination

14   Plaintiffs expert, Dr. Arturo Rosales, testified to the history of discrimination against

15   Latinos in Arizona from before statehood to the 1970's, and as to one court case in the 1990's.

16   (Trial Tr. 264). Defendants do not contest these facts. Dr. Rosales concluded that

17   discrimination against Latinos in Arizona has historically hindered their ability to fully

18   participate in the political process. (Trial Tr. 363). The Court agrees.

19   From the beginning of Arizona's territorial history, Mexicans were excluded from the

20   political process and discriminated against. (Trial Tr. 353-55). While still a U.S. territory,

21   Arizona legislators adopted constitutional codes that restricted electoral eligibility

22   requirements that allowed only white males and white Mexican males, a vast minority, to

23   vote. Id. at 354.

24   Just prior to 1910, Arizona voters passed a literacy law that explicitly targeted

25   Mexicans and disqualified non-English speakers from voting in state elections. Id. at 353-54.

26   As late as 1960's, these literacy requirements were a precondition to voter registration in

27   Arizona. Id.

28

1       After Arizona attained statehood in 1912, there was an anti-immigrant campaign

2   characterized by increasingly racist rhetoric and a series of proposals restricting Mexican

3   immigrants' political rights and the right to work in Arizona.  Id. at 359-60.  The new

4   Arizona constitution restricted non-citizens from working on public projects. Id. at 361-62.

5   And, in 1914, the legislature enacted the "eighty percent law," which stated that eighty

6   percent of the employees in businesses that had five or more employees had to be

7   "native-born citizens of the United States." Id.  Employment discrimination continued

8   throughout various sectors of the Arizona economy.  Id. at 360-61.  As recently as the 1990's

9   in Tempe, Mexican-Americans brought a successful federal lawsuit in which they alleged

10  systematic racial discrimination in employment practices against the City of Tempe. Id.

11      Latinos have also suffered a history of segregation.  After World War II, Phoenix

12  segregated Mexican American veterans in separate housing units.  Id. at 362.  Segregation

13  of Latinos also occurred in schools, housing, theaters, swimming pools, parks, and

14  restaurants.  Id.  Even after Mexican parents began to challenge school segregation

15  successfully in court, school districts failed to comply with integration rulings. Id. at 357-58.

16  Dr. Rosales credibly testified that segregation persists due to a lack of funding for English

17  Language Learner programs.  Id. at 358-59.

18                          b.      Current Demographic and Socioeconomic Statistics

19      Plaintiffs' expert, Dr. Jorge Chapa, testified to current demographic and

20  socioeconomic statistics in Arizona.  In 2006, Arizona's total population was 6,166,318, and

21  its citizen voting age population ("CVAP") was 3,973,912. (Ex. 862, Tables 1, 3).

22  Approximately one-third of Arizona's total population was Latino, and 17% of Arizona's

23  CVAP was Latino.  Id. at Tables 1, 9e.

24      Between 2000 and 2006, Arizona's CVAP grew by 17.3%.  Id. at Table 9e.  Between

25  2000 and 2004, the Latino CVAP grew at a rate of 16.7%, and white, non-Latino CVAP at

26  4.55%.  (Trial Tr. 55-65).  Between 2005 and 2006, the Latino CVAP grew at a rate of

27  4.62%, and non-Latinos at 5.82%.  Id.

28

1   As of 2006, Latinos had lower levels of education when compared to white
2   non-Latinos. (Ex. 862, Tables 6a, 6b; Trial Tr. 41-42). The average personal income of
3   Latinos was also lower than white, non-Latinos. (Ex. 862, at Table 7 (Latino: $25,433;
4   White, non-Latino: $37,843)).

5   In addition, as of 2004, the Latino voter registration rate is 56%, compared to 76% for
6   white, non-Latinos. Id. at Table 8a. The percent of Latino citizens who voted is also lower
7   compared to white, non-Latinos, 47% and 70%, respectively. Id. Dr. Chapa testified that
8   there is a widely held belief that lower socioeconomic status is associated with lower rates
9   of political participation. (Trial Tr. 43-44).

10   There are socioeconomic disparities between Latinos and white, non-Latinos, which
11   hinders Latinos' ability to participate effectively in the political process.

12                     c.      Racially Polarized Voting

13   Dr. Engstrom analyzed ten racially contested (Latino versus non-Latino) elections
14   held in Arizona since 2002 to determine whether voting is racially polarized. (Trial Tr. 99).
15   "Elections between white and minority candidates are the most probative in determining the
16   existence of legally significant white bloc voting." Old Person v. Cooney, 230 F.3d 1113,
17   1123-24 (9th Cir. 2000); see also Gingles, 478 U.S. at 80-82 (relying exclusively on
18   interracial legislative contests to determine whether a legislative redistricting plan diluted the
19   black vote); United States v. Blaine County, Mont., 363 F.3d 897, 911 (9th Cir. 2004)
20   (contests between white and American Indian candidates are most probative of bloc voting).

21   Dr. Engstrom used three standard methodologies to measure racially polarized voting:
22   ecological regression; homogeneous precinct analysis; and ecological inference. Id. at 100-
23   02; see also United States v. City of Euclid, No. 1:06cv01652, 2008 WL 1775282, at *10,
24   13 (N.D. Ohio Apr. 16, 2008) (approving the use of these methods); Bone Shirt v. Hazeltine,
25   336 F. Supp. 2d 976, 1001-04 (D.S.D. 2004) (same) (collecting cases).

26   He analyzed four races in the 2002 Democratic primary; three in the 2004 general
27   election; and three in the 2006 general election. (Ex. 872, Table). In the 2002 Democratic

28                                      - 44 -

1    primary elections, all four races demonstrated racially polarized voting. Id. at 124-25; Ex.

2    872, Table.  In these elections, however, at most 10% of the total electorate voted. (Trial Tr.

3    153-54).

4           In 2004 general election, the Latino-preferred candidate won two out of three

5    elections. Id. at 164. The Latino candidate also received a majority or near-majority of the

6    non-Latino votes in two out of three races.  (Ex. 872, Table).  While Representative Pastor

7    commanded a majority of the non-Latino vote, Representative Grijalva obtained a near-

8    majority: 49.4% of the non-Latino vote according to ecological inference, 48.4% according

9    to ecological regression, and 56.4% according to homogeneous precinct analysis.  Id.

10          In 2006 general election, after the implementation of Proposition 200, the Latino

11   preferred candidate again won two out of three elections. (Trial Tr. 164).  The Latino

12   candidate again received a majority of the non-Latino votes in two out of three races.  (Ex.

13   872, Table).  Representative Pastor again commanded, by a large margin, a majority of the

14   non-Latino vote.  Id.  Receiving increased support amongst non-Latinos, Grijalva also

15   commanded a majority of the non-Latino vote.  Id.

16          Dr. Engstrom concluded that Latinos voters prefer Latino candidates. (Trial Tr. 120-

17   21).  With some significant exceptions, he also testified that this preference for Latino

18   candidates is not shared by non-Latino voters. Id. at 121.  These exceptions include U.S.

19   Representatives Ed Pastor and Raul Grijalva.  Id.  Dr. Engstrom attempted to explain the

20   reason for these exceptions was that they were Latino incumbents in Latino-majority

21   districts.  Id. at 122, 123; see also Gingles, 478 U.S. at 57 (incumbency is a special

22   circumstance that may explain minority electoral success in an otherwise racially polarized

23   electorate).

24          Defendants contend Plaintiffs have not established racially polarized voting because

25   the Latino candidates fared better than the non-Latino candidates in two-thirds of the general

26   elections both before and after Proposition 200.  See Bone Shirt, 336 F. Supp. 2d at 1010 ("In

27   order for white bloc voting to be legally significant, [] it ha[s] to be high enough to 'normally

28

1   defeat the combined strength of minority support plus white crossover votes.'" (quoting

2   Gingles, 478 U.S. at 56)) (emphasis added).

3          However, the racially-polarized voting inquiry centers around districts with a non-

4   Latino majority.  See Old Person, 230 F.3d at 1122 (holding that the district court erred by

5   failing to draw a distinction between majority-minority and majority-white districts in

6   determining racial polarization).  "To do otherwise would permit white bloc voting in a

7   majority-white district to be washed clean by electoral success in neighboring

8   majority-[minority] districts."  Id.

9          Examining Latino candidates' performance in majority non-Latino districts in the

10  2004 and 2006 general elections, the Latino preferred candidate lost both times.  (Ex. 872,

11  Table).

12         The Court finds that to some degree there continues to be to some racially polarized

13  voting in Arizona.

14                          d.       Latinos Elected to Public Office

15         As of 2007, there were 354 elected Latino officials in Arizona.  (Trial Tr. 202-03).

16                  ii.      *Causation*

17         Although Plaintiffs have demonstrated, at best, limited statistical disparity and some

18  of the Senate Factors, their Section 2 claim must fail because they have failed to demonstrate

19  causation.

20         To establish a Section 2 claim, Plaintiffs must establish the Proposition 200 results in

21  discrimination "on account of race or color."  42 U.S.C. § 1973.  A mere statistical disparity

22  in impact is not sufficient enough.  Smith v. Salt River Project Agr. Improvement and Power

23  Dist., 109 F.3d 586, 595 (9th Cir. 1997) ("[A] bare statistical showing of disproportionate

24  impact on a racial minority does not satisfy the § 2 'results' inquiry.") (collecting cases).

25  "Instead, Section 2 plaintiffs must show a causal connection between the challenged voting

26  practice and a prohibited discriminatory result."  Id. (emphasis added).

27

28                                             - 46 -

Under the totality of the circumstances, Plaintiffs have failed to demonstrate that Proposition 200 interacts with social and historical conditions to deny Latino voters equal access to the political process and to elect their preferred representatives.  In particular, Plaintiffs have not adduced any evidence that the observed difference in voter registration and voting rates of Latinos is substantially explained by race, as opposed to factors independent of race.  See Salt River, 109 F.3d at 591.  Not a single expert so testified.

Because Plaintiffs have not established that the statistically disproportionate impact suffered by Latinos is on account of race or color, Proposition 200 does not violate Section 2 of the Voting Rights Act.

B.      American Indian Voters

i.      *Statistical Evidence of Disparate Impact*

Plaintiffs did not provide any statistical evidence of a disparate impact on American Indian voters.

ii.      *Senate Factors*

Factors not considered because no evidence was presented at trial are: use of voting practices for discrimination; racially polarized voting; candidate slating process; racial appeals during political campaigns; lack of responsiveness; and tenuousness of the voting practice.

a.      History of Discrimination

Lewis testified, and Defendants do not dispute, that American Indians have suffered a history of discrimination in Arizona.  And the Court so finds.

American Indians were not recognized as citizens until 1924.  Indian Citizenship Act of 1924, 8 U.S.C. § 1401.  And they did not win the right to vote until 1948. (Trial Tr. 445-46 (citing Harrison v. Laveen, 196 P.2d 456 (Ariz. 1948)).

Again, from 1909 until banned by the Voting Rights Act Amendments of 1970, Arizona had a literacy test for voting. (Trial Tr. 354).  Arizona also held English-only

elections until the state became covered by the language minority provisions of the VRA. Id.

b.      Current Socioeconomic Statistics

The Court finds there are substantial socioeconomic disparities between American Indians and the Arizona population as a whole, which hinders American Indians' ability to participate effectively in the political process.

As of 2000, 13.9% of Arizonans lived below the poverty line, compared to 38% of the American Indian population.  (Trial Tr. 461; Ex. 1197-98).  The median household income for all Arizona was $40,388, compared to $23,709 for the American Indian population.  Id.

Among those 18 and over in Arizona, 7.6% had not completed the ninth grade, compared to 30.2% of the American Indian population.  Id.

Among all households in Arizona in 2000, 7.4% had no vehicle available, while 20.3% of American Indian households did not.  (Ex. 1198).

c.      American Indians Elected to Public Office

As of 2007, there were 54 elected American Indian officials in Arizona.  (Trial Tr. 202-03).

iii.    Causation

Under the totality of the circumstances, Plaintiffs have failed to demonstrate that Proposition 200 interacts with social and historical conditions to deny American Indian voters equal access to the political process and to elect their preferred representatives. Therefore, they have not established a Section 2 violation.

**V.      Title VI of the Civil Rights Act of 1964**

Gonzalez Plaintiffs assert Proposition 200's proof of citizenship requirement violates Title VI of the Civil Rights Act by discriminating against naturalized citizens.  Title VI provides in relevant part:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

1   42 U.S.C. § 2000d.

2        To establish a claim under Title VI, a plaintiff must prove that the challenged law

3   intentionally discriminates on the basis of race or national origin.  Alexander v. Sandoval,

4   532 U.S. 275, 280 (2001) (it is "beyond dispute" that "§ 601 prohibits only intentional

5   discrimination"); Alexander v. Choate, 469 U.S. 287, 293 (1985) ("Title VI itself directly

6   reach[es] only instances of intentional discrimination.").  There is no private cause-of-action

7   for mere disparate treatment.  Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 177-78

8   (2005); Sandoval, 532 U.S. at 285.

9        As discussed supra, Section II, Gonzalez Plaintiffs have failed to demonstrate

10   intentional discrimination.  Therefore, they have not established a violation of Title VI.

11

12        Accordingly,

13        **IT IS ORDERED** the Clerk of Court shall enter judgment on behalf of the

14   Defendants.

15        **IT IS FURTHER ORDERED** this case shall be terminated.

16        DATED this 20th day of August, 2008.

17

18

19   _____

20               Roslyn O. Silver
                United States District Judge

21

22

23

24

25

26

27

28

                                    - 49 -